# In the United States Court of Federal Claims

No. 15-78C
(Filed under seal February 2, 2016)
(Reissued February 16, 2016)†

```
* * * * * * * * * * * * * * * *
                               *
                               *     Pre-award bid protest; RCFC 52.1(c)
                               *     Judgment on the Administrative
FEDERAL ACQUISITION            *     Record; U.S. Special Operations
SERVICES TEAM, LLC,            *     Command; FAR § 52.215-1; "late is
                               *     late" rule; Government Control
            Plaintiff,         *     exception applies to electronic
                               *     delivery; systemic failure; incomplete
     v.                        *     record before GAO; prejudice; unequal
                               *     treatment of offerors.
THE UNITED STATES,             *
                               *
            Defendant.         *
                               *
* * * * * * * * * * * * * * * *
```

Sheridan L. England, of Washington, D.C., for plaintiff.

David A. Levitt, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Benjamin C. Mizer, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Martin F. Hockey, Jr., Assistant Director, all of Washington, D.C., for defendant. Captain Heather N. Corrothers, Department of the Air Force, Joint Base Andrews, Maryland, of counsel.

## MEMORANDUM OPINION AND ORDER

WOLSKI, Judge.

Federal Acquisition Services Team, LLC (FAST) brings this pre-award bid protest seeking to enjoin the U.S. Special Operations Command (SOCOM or the agency) from awarding a contract under Solicitation No. H92222-14-R-0019 (the Solicitation) without giving consideration to FAST's proposal. The agency required

---

† This opinion was initially filed under seal, to allow the parties to propose redactions. The government has requested that third-party offerors' names be redacted, and plaintiff concurs. These names have been replaced by the letter given each offeror by the agency, within brackets, such as: "[Offeror O]."

offerors to e-mail their proposals to a particular address, and cautioned them that e-mails with files totaling more than 20 megabytes in size would not get through. Plaintiff's proposal, in files apparently totaling less than the stated limit, was sent to the required address, and received by a government server, more than four and one-half hours before the deadline. A few minutes later, a second server rejected the e-mail, preventing its delivery to the destination mailbox. The agency, as a consequence, determined the proposal was not timely received.

Before the Court are the parties' motions for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC). Among other things, FAST argues that under the "Government Control exception" of the Federal Acquisition Regulation (FAR), 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2), its proposal should have been accepted for consideration. The Court agrees with plaintiff, and finds that the agency acted arbitrarily by rejecting FAST's bid as untimely. As a consequence, and as explained more fully below, plaintiff's motion is **GRANTED** and defendant's motion is **DENIED**.[1]

# I.  BACKGROUND

As will be seen, plaintiff's protest before the Government Accountability Office (GAO) was resolved on less than a full record. Rather than detail the facts in a strictly chronological order, after the treatment of plaintiff's proposal is discussed, the information presented below is split between what was made known to the GAO and what was revealed in the amended and supplemented administrative record before the Court.

## A.  The Solicitation

The United States Special Operations Command issued the Solicitation for the purpose of establishing a contract to provide acquisition, procurement, and financial management support services. The Solicitation was first issued on July 30, 2014, and was amended several times, most importantly for our purposes to change the method of submission. The final version of the Solicitation states, with regard to submissions:

> **L1.4 Electronic Proposal Submission.** Offeror shall submit its proposal by email only to SWMS@socom.mil. Paper or other media will not be accepted. Identify the RFP # in the Subject line. DO NOT ATTACH ZIP FILES OR EXECUTABLE FILES. Only submit one proposal per offeror, multiple proposals will not be accepted. The max

---

[1]  Plaintiff's motion was granted orally during a status conference held on April 30, 2015, and defendant agreed to comply immediately with the decision. This written opinion more fully explains the Court's reasoning, which was summarily presented during the conference.

size of any files coming through on any one email is 20MB.  If needed
you may send multiple emails; ensure they are clearly identified.

**L1.5 Proposal Due Date/Time: 15 September 2014/4:30 PM
Eastern**

Admin. R. (AR) at 477.

Plaintiff e-mailed its proposal to SWMS@socom.mil at 11:56 a.m.[2] on
September 15, 2014.  AR at 640.  The proposal consisted of five files, allegedly
totaling just less than 18 megabytes, which were attached to the e-mail.  AR at 757.
The e-mail was received by the government's Defense Information Systems Agency
(DISA) server, to which e-mails addressed to SOCOM are directed for security
screening.  AR at 507, 608.  Upon the completion of screening, the DISA server
attempted to forward the e-mail to the SOCOM server for delivery to the
SWMS@socom.mil mailbox.  AR at 608, 728.  Delivery to SOCOM's server failed,
and the DISA server generated a notification regarding the delivery failure and
specifying the cause of the failure as "size limit exceeded."  AR at 608, 626.  This
notification was sent to FAST shortly after noon, just minutes after FAST had
e-mailed its proposal.  AR at 608, 625–26.

The first documented attempt that FAST made to contact the contracting
officer (CO), Karen Stevens, after receiving notice of the delivery failure was an
e-mail sent at 8:41 p.m. on September 15, 2014, more than four hours after the
deadline for submissions.  AR at 621.  Plaintiff made several more requests for
confirmation of receipt without receiving any response from the CO.  AR at 622–25.
After being informed by SOCOM's technical support provider "that the email
submitted on September 15, 2014 at 11:56 AM from FAST did not make it onto any
SOCOM servers" and discussing the matter with agency counsel, *see* AR at 503, the
CO finally responded by e-mail at 4:22 p.m. on September 17, 2014, informing
plaintiff that its proposal had not been received, AR at 629.

Plaintiff followed up with three separate e-mails: the first offered to provide
verification of the date and time the e-mail was sent, as well as the size of the
attached proposal, AR at 631; the second cited several FAR provisions relating to
the acceptance of damaged or late proposals, including the Government Control
exception, *see* AR at 633;[3] and the third was largely a copy of the second but
included the time stamp from the failure notice that plaintiff received in response to
its initial submission, *see* AR at 636.  In an e-mail sent at 3:03 p.m. on September
23, 2014, the CO declined to accept FAST's bid, responding in turn to each FAR
provision cited by FAST --- stating in particular that "[t]he 'Government Control'

---

[2]  All times in this opinion refer to Eastern Daylight Time.

[3]  These were 48 C.F.R. §§ 15.207(c) and 15.208(a)–(c).  AR at 633.

exception doesn't apply since there is no evidence that the proposal was received at the Government installation" and that "there is no exception in the FAR that would allow me to accept a late proposal from FAST."  AR at 639.

## B.  The GAO Protest

Plaintiff filed a protest with the GAO on September 25, 2014, complaining that SOCOM had improperly excluded FAST's proposal from consideration under the Solicitation.  *See* AR at 610–11; *see also Fed. Acquisition Servs. Team, LLC* (*FAST*), B-410466, 2015 CPD ¶ 20, 2014 WL 7660997, at *1 (Comp. Gen. Dec. 31, 2014); AR at 755–58.  Plaintiff argued that its bid should have been accepted, because it was submitted by e-mail more than four hours before the deadline, and it was bounced back as "undeliverable" for exceeding the e-mail system's limitations even though the attached files measured less than the 20 megabyte limit specified in the Solicitation.  *FAST*, 2014 WL 7660997, at *2; AR at 756.  Plaintiff also expressed its belief that other offerors may have had their bids "improperly rejected," invoking the GAO's "systemic failure" doctrine, AR at 616; *see also FAST*, 2014 WL 7660997, at *2; AR at 757–58, and sought discovery to support that contention, *see* AR at 641–42.

The Agency Memorandum of Law, submitted as part of the Agency Report in connection with the GAO protest, noted that "[FAST's] proposal was not received at the e-mail address stated in the solicitation at the time stated as the deadline for submission of proposals," and that "[t]he proposal was submitted by electronic means and it was not received at the initial point of entry by 5:00 p.m. the day before proposals were due."  AR at 494.  Citing *Sea Box, Inc.*, B-291056, 2002 CPD ¶ 20, 2002 WL 31445297, at *3 (Comp. Gen. Oct. 31, 2002), the agency then maintained:

> The "electronic commerce" exception [in FAR § 52.215-1(c)(3)(ii)(A)(1)] "unqualifiedly" permits such a late proposal to be considered only if it was received at the initial point of entry to the government infrastructure no later than 5:00 p.m. the preceding working day.  The "Government control" exception does not apply because . . . this exception applies only to proposals submitted by other than electronic means and does not apply to the situation at hand.

AR at 494 (citation omitted).  Also included with the agency report was the CO's statement of facts, executed on November 10, 2014, which reiterated that the Government Control exception was deemed not to apply "since there is no evidence that the proposal was received at the Government installation."  *Id.* at 504.

The agency addressed FAST's contentions about file size by stating that "DISA provided message details for the FAST e-mail submitted on September 15, 2014 at 11:56 a.m.  The message details indicate the message size was 24.84MB,

- 4 -

which exceeds the 20MB size limit provided in the solicitation, when it arrived at the DISA server." AR at 490.[4]  Relying on this information, the agency argued that FAST's e-mail was rejected only "because it was too big." *Id.* at 497.  The agency denied any "systemic failure or impairment" of the e-mail system, concluding that "[FAST's] proposal never arrived [at] the Agency because it did not comply with all requirements of the RFP." *Id.* at 498.

Plaintiff responded with comments to the agency report, in which it noted that the agency provided no evidence to support the argument against systemic failure.  AR at 654, 657.  The protester identified two cases from our court, *Watterson Construction Co. v. United States*, 98 Fed. Cl. 84 (2011), and *Insight Systems Corp. v. United States*, 110 Fed. Cl. 564 (2013), in which the Government Control exception was applied to e-mailed proposals.  AR at 654, 657–58.  And FAST maintained that the possibility that other proposals were rejected would show not only a systemic failure but also an "unanticipated event" meriting relief under 48 C.F.R. § 52.215-1(C)(3)(iv).  AR at 660–61.

As mentioned above, plaintiff also sought documents from DISA regarding e-mails accepted or rejected by the DISA server in connection with the Solicitation. AR at 642.  The agency opposed FAST's request, *see id.* at 643–45 (Response to Document Request), and it was denied by the GAO on November 13, 2014, *see id.* at 664.  But after reviewing FAST's comments to the agency report, the GAO apparently requested from the agency a supplemental report identifying all other proposals rejected by the agency's system and the reasons for the rejection.  *See* AR at 664.  As we shall see, this information would be produced in fits and starts, and never completely.

The agency first submitted a declaration, executed the day after Thanksgiving, from Marc E. Dugroo, a DISA employee.  AR at 670 (Dugroo Decl.). He was apparently asked to provide a list of the e-mails sent to the SWMS@socom.mil address and rejected by the SOCOM server within the twenty-four hour window preceding the deadline for filing proposals.  *Id.*  The record contains no explanation for why such a truncated search was requested, and it is particularly puzzling considering that the deadline for proposals fell on a Monday, making the previous business day many more than twenty-four hours prior to the deadline.  In any event, Mr. Dugroo stated that short staffing during the holiday prevented him from finishing the task, but that it should be completed within one week.  *Id.*  Attached were e-mail message reports detailing eight e-mails (including FAST's) that were rejected by the SOCOM server on September 15, 2014, the earliest received at 9:20 a.m. and the latest after the deadline, at 4:33 p.m.  AR at

---

[4]  According to DISA employee Kurt Patrick Beernink, "24.84MB is the 'real size' of the email," which "includes the size of the e-mail message itself, all attachments, and any additions made to the e-mail, such as MIME encoding, that may have occurred to the e-mail prior to its arrival to the DISA server."  AR at 507.

671–85 (e-mail message details).  Whether the requested search was ever completed remains a mystery.

A supplement to the CO's statement of facts, executed November 26, 2014, was also submitted by the agency.  *See* AR at 720–23.  This statement provided information about difficulties other offerors encountered in transmitting their proposals.  *See* AR at 721.  The CO stated:

> Other than the email sent by [FAST], I'm aware of 2 offerors that had email proposal submissions rejected by USSOCOM servers because they exceeded size limitations.  In both cases, the offerors timely submitted the proposal documents as multiple or reduced size emails and the proposals were accepted.  I have not been contacted by any other parties besides the protester and the offerors listed below, indicating they had an issue with emails being rejected.

*Id.* at 721.  The CO identified [Offeror D] and [Offeror I] as the other offerors reporting trouble.  *Id.* at 721–22.

On December 1, 2014, plaintiff responded to the Dugroo declaration, the CO's supplement, and a supplemental brief from the agency.[5]  AR at 701–15.  The protester relied upon, and attached, a declaration by Salman Mohammed, purportedly a computer science expert.[6]  *See* AR at 716–18.  Plaintiff's declarant found that "the attachments [to FAST's proposal submission e-mail] are approximately 18MB" and stated that, after examining the relevant evidence, "I determine to a reasonable degree of professional certainty that FAST's email could not exceed 19MB when transmitted to DISA."  *Id.* at 716 (Mohammed Decl.).

The second declaration of DISA employee Kurt Patrick Beernink was then submitted to the GAO.  AR at 724 (Beernink Decl.).  The Beernink declaration stated:

> As part of normal message processing, the DISA server adds text headers to [an e-mail] documenting the processing performed on the message.  These headers add approximately 1.5Kbytes to the overall message size . . . .  Since the size of the message as received by DISA already exceeded the maximum message size of the SOCOM server,

---

[5]  The last-mentioned of these documents apparently did not find its way into the administrative record.

[6]  Mister Mohammed earned a master's degree in computer science in 2002 and has managed his own information technology company, of which he is the chief executive officer, for more than twelve years.  AR at 716.

the addition of the DISA processing headers did not cause the SOCOM server to reject the modified message.

*Id.* at 724.

On December 3, 2014, the CO executed a declaration, which was also added to the agency report. AR at 725. Attached was a list of the e-mails conveying proposals in response to the Solicitation that were received by the CO. *Id.* at 726. The list of e-mails detailed the total size of attachments to each e-mail, the total size of each e-mail, the offeror associated with each e-mail (identified by letter), and "the date and time which it was received in [the CO's] swms@socom.mil account." *Id.* at 725; *see id.* at 726 (giving details for thirty-two e-mails sent by fifteen offerors).

That same day, apparently, *see* AR at 719 (Tab 21 of the agency exhibit list), the agency submitted an additional statement at the request of the GAO. AR at 727–35. In this document, the agency discussed the information in the Dugroo declaration, stating that a review of the records covering the twenty-four hour period preceding the deadline shows that "eight emails received by DISA were not forwarded to the SOCOM servers. Six emails were rejected because they exceeded the file size limit . . . . Two emails were not forwarded because . . . the connection . . . was terminated." *Id.* at 728. Of the six that were too large, one came from [Offeror D], three came from [Offeror I] and one was FAST's. *Id.* at 728–30.[7] The agency noted that the e-mail message report for FAST's e-mail indicated "[t]he email's size was 24.84MB when it entered the government system." *Id.* at 728.

The GAO issued its decision denying the protest on December 31, 2014. Relying on the CO's supplemental statement, the GAO acknowledged the existence of one other offeror which contacted the CO regarding difficulties with transmitting its bid, but noted that that offeror had then divided the bid into separate parts and successfully submitted it before the close of bidding. *FAST*, 2014 WL 7660997, at *2 n.3; AR at 757. The GAO explained that it has "consistently declined to require an agency to consider a proposal where, as here, there is no evidence that the proposal was 'actually received.'" *FAST*, 2014 WL 7660997, at *2; AR at 757 ("FAST's proposal was rejected . . . by the agency's server; was never received at the agency email address designated for receipt of proposals; and ca[nn]ot be retrieved from the agency's servers.").

The GAO eschewed any discussion of the Government Control exception, apparently because the GAO does not believe that it should apply to electronic delivery methods. The GAO also declined to wade into the factual dispute over e-mail size. *FAST*, 2014 WL 7660997, at *3; AR at 757–58. It observed that FAST could have divided and resent its proposal in the four hours between the receipt of

---

[7] The sixth came from a prospective sub-contractor. *See* AR at 683–84, 754.

the bounceback notice and the deadline for submissions, as other bidders had. *FAST*, 2014 WL 7660997, at \*3; AR at 758.

Finally, the GAO found that a systemic failure was not shown by FAST. It explained that a systemic failure required more than a negligent loss of a proposal, such as a malfunction causing all quotations to be lost or the unexplained loss of two quotations in the same week. FAST, 2014 WL 7660997, at \*3; AR at 758 (citing *S.D.M. Supply, Inc.*, B-271492, 96-1 CPD ¶ 288 at 4–5 (Comp. Gen. June 26, 1996) and *East West Research, Inc.*, B-239565 & B-239566, 90-2 CPD ¶ 147 (Comp. Gen. Aug. 21, 1990)). Citing the record, the GAO stated that "the agency successfully received 15 proposals, in 32 total emails containing proposal information. . . . [T]hree proposals initially were rejected by the SOCOM server on September 15 for exceeding the size limit, but two of the proposals were successfully resubmitted," and "[o]nly FAST made no attempt to resubmit its proposal prior to closing." *FAST*, 2014 WL 7660997, at \*3; AR at 758. The GAO found that "even if there were problems with respect to the agency server's implementation of the email size limitation, those problems did not amount to a 'systemic failure.' All offerors that diligently pursued submission of their proposals were eventually successful, and the agency received 15 timely proposals." *FAST*, 2014 WL 7660997, at \*3; AR at 758. The GAO thus denied FAST's protest.

## C. The Administrative Record

Plaintiff filed its complaint in our court on January 27, 2015. In the complaint, FAST challenged the rejection of its offer, alleging the e-mail delivering the proposal was less than 20 MB in size and was timely received by a government server. Compl. ¶¶ 1, 10–13, 25, 39. Plaintiff contended that the agency's rejection was arbitrary and capricious, as its proposal complied with requirements and should have been considered received under the Government Control exception of 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2). *See id.* ¶¶ 23–24, 26–28, 38–42.

The government filed the administrative record on February 6, 2015, consisting of the Solicitation, the amendments to the Solicitation, most of the record before the GAO, the GAO's decision, and FAST's request for reconsideration. On February 12, 2015, plaintiff filed a motion to supplement the administrative record and for leave to conduct discovery. *See* Mot. to Supp. Admin. R. at 1. Plaintiff sought to add a variety of materials to the administrative record, including e-mails between FAST and the CO that were already included in the administrative record; documents relating to two solicitations associated with the one at issue here; screen captures from the FedBizOpps.gov website concerning the two related solicitations; the declaration of the chief executive officer of another company which submitted a proposal; and e-mails between that declarant and the CO regarding e-mail difficulties. *See* Supp. to Mot. to Supp. Admin. R., ECF No. 14.

Shortly thereafter, the government amended the administrative record on its own, adding documentation of e-mail correspondence between the CO and prospective offerors regarding submission difficulties. *See Fed. Acquisition Servs. Team, LLC (FAST II)*, No. 15-78C, 2015 WL 892444, at *1 (Feb. 24, 2015); AR at 823–90. After a hearing, the Court granted plaintiff's motion in part, ordered limited supplementation of the record,[8] and allowed deposition of the CO by written questions. *See FAST II*, 2015 WL 892444, at *2. Certain key facts that the Court finds relevant to the disposition of this case are contained in the amendment to administrative record and the CO's answers to the written deposition questions.

First, the amended record reveals that a minimum of seven offerors informed SOCOM of problems in transmitting proposals to the SWMS@socom.mil e-mail address.[9] Six of them corresponded directly with the CO. In addition to FAST and the two offerors the CO acknowledged in the GAO proceeding,[10] two other offerors corresponded with the CO by e-mail on September 15, 2014, concerning proposal e-mails with files purportedly under the 20 megabyte limit being rejected due to their size. *See AR at 862 ([Offeror L], a size rejection of a 15 MB file); id. at 884 ([Offeror N]). The sixth e-mailed her on September 12, the Friday before the deadline, informing her that one e-mail had been apparently rejected (for unspecified reasons). Id. at 881 ([Offeror K]). A seventh offeror's CEO sent a copy of its proposal to another employee of SOCOM to verify receipt of the proposal, with a message indicating: "I know that SOCOM has had some server problems recently." AR at 888 ([Offeror O]).

A review of the dialogue between the CO and [Offeror L] provides a sense of the difficulties faced by offerors. On September 13, 2014, at 9:03 p.m., [Offeror L's] CEO sent the CO an e-mail informing her: "I attempted to send [Offeror L's] Submission for the SWMS-C effort. I received the below notice stating the delivery failed. Per the RFP at L1.4, the maximum file size is 20MB. Our Volume I file is 15MB. Please advise on how to resolve this issue." AR at 864. On September 15, 2014, at 7:39 a.m., the CO responded, "Please try to resubmit to swms@socom.mil." *Id.* Later that morning, at 9:31 a.m., [Offeror L's] CEO reported: "It appears that the capitalization case made the difference. I initially used the case in the RFP, as I

---

[8] The administrative record was supplemented with the documents and screen captures associated with the two related SOCOM solicitations, as well as the CO's answers. *FAST II*, 2015 WL 892444, at *2.

[9] Although the agency denied having received a proposal from plaintiff, for ease of reference the Court includes FAST among the number of offerors in this opinion.

[10] *See* AR at 721–22 ("Other than the email sent by [FAST], I'm aware of 2 offerors [Offeror D] and [Offeror I] that had email proposal submissions rejected by USSOCOM servers because they exceeded size limitations.").

am not used to seeing capitalization making a difference." *Id.* He noted, however: "I was able to [get] delivery receipts for each of the 4 emails with the exception of the first email that contains the 15MB Volume I file. It has not kicked back, but is there a way to check if all 4 emails arrived, since I was only provided receipts for 3 of 4?" *Id.*

Fourteen minutes later, [Offeror L's] CEO reported, "I just received this delivery failure for email 1 of 4. The file size is 15MB. Please let me know what else I should do." AR at 862. The CO responded at 9:51 a.m. that the offeror should "try submitting the document in multiple emails." AR at 860. [Offeror L] then explained, at 10:33 a.m., that it was "working to get the file size smaller than 15MB," and asked, "Do we know what the actual limit is?" *Id.* The [Offeror L] CEO added:

> Also, to make sure I understand correctly, this email contains my entire Volume I PDF file only. Are you asking me to break this file up into more than one PDF and transmit it? If so, and if I cannot get the single file smaller, how should I label the emails to ensure each section is identified adequately for reassembly into the Volume I document? This unfortunately will drastically alter the presentation of my Volume I.

*Id.*

> The CO responded at 10:47 a.m.:

> I am able to accept files less than 20MB so I am not sure what the particular issue you are having with Vol 1 would be. I have cleaned out the swms@socom.mil mailbox. If you can separate the files by sub-factors that should be easier to identify. Please try reducing the size first. Thank you.

AR at 858.

At 11:56 a.m., [Offeror L's] CEO informed the CO: "We were able to shrink the file by more than 1MB. I tried sending and received a delivery receipt. Can we check to ensure that [Offeror L's] Email 1 of 4 with the Volume I PDF with 'Attempt 2' in the file name was received?" AR at 856. Finally, at 12:11 p.m., the CO sent to [Offeror L] an e-mail confirming receipt of all four volumes of the proposal. AR at 855. Inexplicably, the CO failed to recall this prolonged exchange when she told the GAO: "I have not been contacted by any other parties besides the protester and the

offerors listed below [Offeror D and Offeror I], indicating they had an issue with emails being rejected." AR at 721.[11]

The supplemented record also shows that [Offeror O's] proposal was accepted by the agency although the proposal was received by the CO the day after the deadline in the CO's work e-mail, and was never received at the e-mail designated in the Solicitation. *See* AR at 888; Def.'s Notice of Filing of Contracting Officer's Answers to Written Dep. Questions (Def.'s Notice), Attach. (Stevens Decl.) ¶ 1 ("No, I did not receive an email proposal from [Offeror O] to SWMS@socom.mil.").[12] Although [Offeror O's] CEO stated in his September 15, 2014 e-mail to a SOCOM employee that he sent the proposal at 3:56 p.m. to the proper address, it neither made its way to that mailbox nor shows up in the e-mail message reports detailing e-mails that were rejected by the SOCOM server on that day. *See* AR at 671–85. Whether a typographical error in the address precluded delivery, or the proposal was rejected by the DISA or SOCOM servers, cannot be determined from the record.

The amended record further shows that the offer submitted by [Offeror I] was accepted even though a portion of it was received after the deadline. *See* AR at 833 (showing volume four received on September 15 at 4:34 p.m.).[13]  The Court notes

---

[11] Although [Offeror L] received a notification at 9:43 a.m. on September 15 that its volume one e-mail was rejected because the size limit was exceeded, *see* AR at 862, the only [Offeror L] e-mail detailed in the DISA e-mail message reports was rejected due to a lost connection with the sending server, *see* AR at 685.

[12] In her answers to the written deposition questions, the CO acknowledged that her earlier declaration submitted to the GAO misrepresented the address at which [Offeror O] proposal was received, but explained that the "[p]roposal receipt location wasn't the focus of that declaration but rather the email sizes of proposals." See Stevens Decl. ¶ 1.a; AR at 725. Instead of reporting the date and time the CO received the proposal when forwarded by another SOCOM employee, her declaration used the date and time that the proposal was received by that other employee. *Compare* AR at 725–26 (listing "the date and time which [[Offeror O's] proposal] was received in my swms@socom.mil account" as "09/15/14" at "4:12 PM"), *with* Stevens Decl. ¶ 1.b ("On Tuesday, September 16, 2014, Small Business Director, Christopher Harrington, advised me that he had received a proposal from [Offeror O]. . . ."); *see also* Stevens Decl. ¶ 1.a (stating that [Offeror O] was "Offeror O" as listed in the CO's declaration on AR page 726); AR at 888 (forwarded message received by CO at 12:03 p.m. on Sept. 16, 2014).

[13] At the hearing on the cross-motions, defendant's counsel admitted that part four of [Offeror I's] proposal arrived at the SWMS@socom.mil e-mail inbox after 4:30 p.m., but explained that the agency did not consider that part to contain "evaluative material" subject to the deadline. Mar. 30, 2015 Hr'g (Hr'g) at 11:41–42. The

that the November 26, 2014 supplemental statement submitted by the CO to the GAO states that [Offeror I] and one other offeror, after having e-mailed proposals rejected "because they exceeded size limitations[,] . . . *timely submitted* the proposal documents as multiple or reduced size emails and the proposals were accepted," AR at 721 (emphasis added), and that [Offeror I] "resubmitted the email containing an 8MB Part 4 attachment to SWMS@socom.mil," AR at 722.  The CO, however, omitted [Offeror I's] e-mail resubmission of part four of its proposal from the December 3, 2014 declaration detailing the sizes, dates, and times of offerors' e-mail submissions.  *See* AR at 726 (Offeror I); *see also* AR at 853.

Finally, the administrative record cannot account for at least two e-mails which conveyed proposals.  In addition to [Offeror O's] e-mail, addressed above, at least one of [Offeror I's] e-mails also appears to have never made it to the SWMS@socom.mil mailbox even though it was only approximately eight megabytes.[14]

## II. DISCUSSION

Plaintiff has moved for judgment on the administrative record, arguing primarily that the receipt of its proposal by the DISA server before the submission deadline required the agency to accept and consider the proposal under the Government Control exception.  *See* Mot. J. Admin. R. (Pl.'s Mot.) at 12–16. Plaintiff maintains that SOCOM's rejection of its proposal was arbitrary and capricious, as the Government Control exception was used to accept [Offeror O's] proposal, and problems with the agency's server prevented the e-mails of FAST and six other offerors from reaching the CO.  *Id.* at 21–28.  The government has cross-moved for judgment, contending that FAST's proposal was never received or controlled by the agency, and that this was because the e-mail containing the

---

Solicitation called for part four of the offer to include "Representations, Certifications and Other Statements of Offerors."  *See* AR at 441, 464–73.

[14]  The amended administrative record shows that [Offeror I] sent part four of its proposal in an eight megabyte portable document format (PDF) two times between 4:22 p.m. and 4:35 p.m. on September 15, 2014.  *See* AR at 839 (stating, at 4:22 pm, "I can quickly send a PDF that is 8mg [sic]"); *id.* at 837 (stating, at 4:33 pm, "I am not sure which one is kicking back I resent the work [sic] version (18 MB) and a PDF version (8 MB)"); *id.* at 833 (stating, at 4:34 pm, "[r]esent word version but here is PDF as well").  The summary of e-mail correspondence between the CO and [Offeror I], however, shows that only one copy of the eight megabyte version of part four was received, at about 4:35 pm.  *See* AR at 853.  The DISA e-mail message reports show three e-mails from [Offeror I], each greater than 24.6 megabytes, rejected as too large by the SOCOM server between 4:29 p.m. and 4:55 p.m.  AR at 672–77.

proposal was too large when sent by FAST.  Def.'s Cross-Mot. J. on Admin. R. &
Opp'n to Pl.'s Mot. J. on Admin. R. (Def.'s Mot.) at 15–23, 25–29.

## A. Legal Standards

A motion for judgment on the administrative record pursuant to RCFC 52.1
differs from a motion for summary judgment under RCFC 56, as the existence of
genuine issues of material fact does not preclude judgment on the administrative
record.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355–57 (Fed. Cir. 2005);
*Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006).  Rather, a
motion for judgment on the administrative record examines whether the agency,
given all the disputed and undisputed facts appearing in the record, acted in a
manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law.  *See Fort Carson*, 71 Fed. Cl. at 585; *Greene v. United States*,
65 Fed. Cl. 375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388
(2005).  Factual findings are based on the evidence in the record, "as if [the Court]
were conducting a trial on the record."  *Bannum*, 404 F.3d at 1357; *see also
Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337 (2009); *Gulf Grp. Inc. v.
United States*, 61 Fed. Cl. 338, 350 (2004).

Under the "arbitrary and capricious" standard, the Court considers "whether
the decision was based on a consideration of the relevant factors and whether there
has been a clear error of judgment" by the agency.  *Citizens to Preserve Overton
Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Although "searching and careful, the
ultimate standard of review is a narrow one.  The court is not empowered to
substitute its judgment for that of the agency."  *Id.*  The Court will instead look to
see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory
explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.
Co.*, 463 U.S. 29, 43 (1983), and "may not supply a reasoned basis for the agency's
action that the agency itself has not given," *Bowman Transp., Inc. v. Ark.–Best
Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).  The Court must determine whether
"the procurement official's decision lacked a rational basis."  *Impresa Construzioni
Geom. Domenico Garufi, v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)
(adopting Administrative Procedure Act standards developed by the D.C. Circuit);
*see also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984).  A
second ground for setting aside a procurement decision is when the protester can
show that "the procurement procedure involved a violation of regulation or
procedure."  *Domenico Garufi*, 238 F.3d at 1332.  This showing must be of a "clear
and prejudicial violation of applicable statutes or regulations."  *Id.* at 1333 (quoting
*Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under the first, rational basis ground, the applicable test is "whether 'the
contracting agency provided a coherent and reasonable explanation of its exercise of
discretion.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v.
United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  This entails

determining whether the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or made a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Because of the deference courts give to discretionary procurement decisions, "the 'disappointed bidder bears a heavy burden of showing that the [procurement] decision had no rational basis.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). "The presence (by the government) or absence (by the protester) of any rational basis for the agency decision must be demonstrated by a preponderance of the evidence." *Gulf Grp.*, 61 Fed. Cl. at 351; *see Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003); *Info. Tech. & Appl'ns Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001) (citing *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997)), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003). If arbitrary action is found as a matter of law, the Court will then decide the factual question of whether the action was prejudicial to the bid protester. *See Bannum*, 404 F.3d at 1351–54.

## B. Analysis

The main issue presented by this protest is whether the Government Control exception, 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2), applies to the circumstances of FAST's proposal submission. The record shows that FAST's proposal, contained in five files that were measured to total 17.93 megabytes when e-mailed to the SWMS@socom.mil address, *see* AR at 620, was received four hours and thirty-one minutes before the deadline by the first government server that processes e-mails addressed to SOCOM, AR at 681. After the e-mail, measured at 24.84 megabytes when received, was scanned for viruses and spam, four minutes later it was forwarded to, and was rejected by, the SOCOM server, due to its size. AR at 680–81. The record also shows that four other offerors had proposals rejected due to the size limit, although the files measured less than 20 megabytes when sent. *See* AR at 825, 837, 862, 884, 887. As explained below, the Court concludes that the Government Control exception does apply, and that SOCOM acted arbitrarily in not accepting plaintiff's proposal.[15]

---

[15] Because of this determination, which was previously announced and has been followed by SOCOM, it is unnecessary to consider plaintiff's alternative argument that its proposal should have been accepted under the unanticipated event exception, 48 C.F.R. § 52.215-1(c)(3)(iv).

### *1.  The Government Control Exception*

The relevant FAR provision governing the timing of proposal submission, incorporated into the solicitation by reference, *see* AR at 474, states that "[o]fferors are responsible for submitting proposals, and any modifications or revisions, so as to reach the Government office designated in the solicitation by the time specified in the solicitation."  48 C.F.R. § 52.215-1(c)(3)(i) (2015).  The next sub-clause provides that "[a]ny proposal, modification, or revision, received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered," unless certain exceptions apply.  *Id.* § 52.215-1(c)(3)(ii)(A).  Referred to collectively as the "late is late" rule, *see Insight Sys.*, 110 Fed. Cl. at 574, these provisions are generally taken to bar the consideration of any proposal that arrives even moments after the deadline, with the goal of "alleviat[ing] confusion, ensur[ing] equal treatment of all offerors, and prevent[ing] one offeror from obtaining a competitive advantage that may accrue where an offeror is permitted to submit a proposal later than the common deadline set for all competitors," *Philips Healthcare Informatics*, B-405382.2 *et al.*, 2012 CPD ¶ 220, 2012 WL 3611711, at *4 (Comp. Gen. May 14, 2012).

Taken together, the language of these provisions has been interpreted by both the GAO and our court to impose upon the offeror the obligation of ensuring that any proposal it submits by electronic means --- when allowed or required by the terms of a solicitation --- is received before the deadline, taking into account the possibility of reasonably foreseeable circumstances which may delay the delivery of its proposal.  *See Insight Sys.*, 110 Fed. Cl. at 574 ("[I]t is an offeror's responsibility, when transmitting its proposal electronically, to ensure the proposal's timely delivery by transmitting the proposal sufficiently in advance of the time set for receipt of proposals to allow for timely receipt by the agency." (quoting *Philips Healthcare*, 2012 WL 3611711, at *4)).

The FAR itself, however, enumerates certain exceptions to the "late is late" rule.  Section 52.215-1 states that a late proposal may be considered if:

> it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and
>
> (1) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the  government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or
>
> (2) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers . . . .

48 C.F.R. § 52.215-1(c)(3)(ii)(A)(1)–(2).[16]  Of these two exceptions, the former does not apply, because FAST concededly did not attempt to transmit its proposal by 5:00 p.m. the work day before the proposal deadline.  *See* AR at 640 (showing proposal was sent at 11:56 am on the day proposals were due).[17]

It is not disputed that the two qualifying conditions for the application of an exception to the "late is late" rule are met.  Because of CICA stays triggered by GAO protests, and the agency's voluntary stay to accommodate this protest, an award had not been made prior to the Court's oral decision in this case.  Thus, the order that the agency accept FAST's proposal for evaluation resulted in the agency receiving the proposal before award and the procurement was not unduly delayed.  *See* 48 C.F.R. § 52.215-1(c)(3)(ii)(A).  Nor did the government argue that the Government Control exception cannot apply to e-mailed proposals, as it recognized that "[r]ecent precedents of this Court clearly indicate that the control exception applies to email proposals."  Def.'s Mot. at 21–22 (citing *Insight Sys.*, 110 Fed. Cl. at 574–81, and *Watterson Constr.*, 98 Fed. Cl. at 95–97).[18]

In any event, the Court is persuaded by the reasoning contained in the two precedents discussed by the parties and concludes that the Government Control exception does apply to proposals that are sent by e-mail.  The opinion in *Watterson Construction Co.* convincingly explains, through analysis of the text and the regulatory history, that the FAR's retention of the "Electronic Commerce exception," 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(1), should not be construed as removing e-mailed proposals from the protection of the Government Control exception.  *See Watterson Constr.*, 98 Fed. Cl. at 95–97.  And the opinion in *Insight Systems Corp.*, construing the substantively-equivalent version of the exceptions from the provision employed in commercial items procurements, *see* 48 C.F.R. § 52.212-1(f)(2)(i)(A)–(B), is extremely persuasive in concluding that the Government Control exception applies

---

[16]  A third exception, when a proposal "is the only proposal received," 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(3), is obviously irrelevant to this proceeding.

[17]  Plaintiff also maintains that receipt of its e-mail by the DISA server constituted timely receipt of the proposal at "the Government office designated," and thus no exception need be applied.  Pl.'s Mot. at 12–13.  While there is some support for this proposition, *see Watterson Constr.*, 98 Fed. Cl. at 93, the Court is not persuaded that, under the circumstances presented, the DISA server may be considered a "Government office designated in the solicitation," 48 C.F.R. § 52.215-1(c)(3).

[18]  The government noted that an earlier decision from our court, *Conscoop-Consorzia Fra Cooperative Di Prod. E Lavoro v. United States*, 62 Fed. Cl. 219, 239–40 (2004), found the exception did not apply to e-mailed proposals, but conceded that the latter precedents holding to the contrary "discuss the issue in more detail."  Def.'s Mot. at 22 n.8.

to proposals submitted electronically.  *See Insight Sys.*, 110 Fed. Cl. at 574–81.  The Court adopts the reasoning detailed in those portions of the opinions without reservation.  Of particular note is the latter opinion's explanation why application of the Government Control exception to electronic submissions does not render the Electronic Commerce exception superfluous --- as the latter would apply when a transmission is rejected by the first server in the government system, while "control" of the proposal for purposes of the former requires more, such as the first server running security checks on a message and attempting to forward it to the next government server.  *See id.* at 577, 579 n.20.

This protest turns on whether, under the Government Control exception, FAST's proposal "was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers."  48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2).  Plaintiff argues that it was, following the reasoning of the two precedents discussed above.  *See* Pl.'s Mot. at 13–16; Pl.'s Reply in Supp. Mot. J. on Admin. R. (Pl.'s Reply) at 6–9.  Defendant maintains that it wasn't, attempting to distinguish those precedents.  *See* Def.'s Mot. at 15–23; Def.'s Reply to Pl.'s Resp. to Def.'s Cross-Mot. (Def.'s Reply) at 2–5.

In *Watterson Construction Co.*, after examining the historical background of the Government Control exception, the court determined that "neither the text of [the Government Control exception] nor the regulatory history supports a construction that would require an offeror, after relinquishing control of an e-mail proposal, to be responsible for the risk of late delivery when technical problems arise after an e-mail proposal reaches the e-gateway to a designated Government office."  *Watterson Constr.*, 98 Fed. Cl. at 97.  In that case, an e-mail containing a proposal was timely received by "the first of four Army Corps servers," which was described as an "e-mail gateway," but made it to the e-mail inbox thirty-five minutes later (and four minutes too late) because the Army Corps's "bridgehead e-mail servers" had "come to a crawl" due to excessive traffic.  *Id.* at 87 & n.4.

*Insight Systems Corp.* looked more closely at the mechanics of the electronic transmission process in considering the Government Control exception in the context of that case.  There, e-mails sent to the agency had to pass through three levels of computer servers before delivery to the recipient.  *Insight Sys.*, 110 Fed. Cl. at 570.  The offerors' e-mails only reached the first level of servers, which performed security screening on the e-mails but were unable to forward them to the next level of servers (the "bridgehead" servers) and on to the destination e-mail address (via the "mailbox" servers) until after the deadline.  *Id.* at 570–71.  The court first found that the initial servers, operated under contract by a private entity, *see id.*, constituted a "government installation" for purposes of the Government Control exception, *id.* at 578 ("[M]uch like a mail room or other depository in a building, to which paper proposals can be delivered --- a server controlled by the government most certainly can be an 'installation' that receives electronic submissions.").  The court then found that the "proposals in question were 'received' when the [initial]

server 'took' the electronic messages submitted by plaintiffs, submitted them to security checks, and, once those checks were passed, attempted to forward them, albeit unsuccessfully, to the second server in [the agency's] mail system." *Id.* at 577.

The government contends that *Watterson Construction Co.* and *Insight Systems Corp.* can be distinguished from the circumstances presented in this case, based on the fact that the initial government server chosen by the Department of Defense to be the entry point to SOCOM's e-mail system is operated by DISA, a separate, autonomous entity within the department. Def.'s Reply at 3–5; Def.'s Mot. at 17–20. The Court fails to see how this is a material distinction --- after all, the FAR provision applies to proposals "under the Government's control," 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2), and is not limited to proposals "under the procuring agency's control" or "the contracting officer's control." In addition, the proposal must, before the deadline, be "received at the Government installation designated for receipt of offers," *id.*, rather than at "the Government office designated in the solicitation."[19]

Defendant maintains that the language from the earlier of the two opinions, applying the exception "when technical problems arise after an e-mail proposal reaches the e-gateway to a designated Government office," *Watterson Constr.*, 98 Fed. Cl. at 97, requires that the proposal be received by a server within the procuring agency that can deliver the proposal to the e-mail address inbox. *See* Def.'s Reply at 2–3. But that opinion did not define "the e-gateway" in those terms, and while some detail was lacking, it suggested that the e-mailed proposal needed to pass to at least one additional server before being delivered. *See Watterson Constr.*, 98 Fed. Cl. at 87.[20] All we can know for sure is that the proposal was timely received by one government server that was "located directly behind [an agency] firewall facing the Internet." *Id.* (internal quotations omitted). The implication is that this was the first government sever to receive the proposal, and whether that server was within the agency or not was not the important point.

---

[19] Thus, were the proposal e-mailed to a different address at a different government department --- say, the United States Department of Agriculture --- the exception would not apply, as notwithstanding government control it would not have been received at the designated installation.

[20] The Court notes that, while the SOCOM server apparently bears the name "mailgateway3.socom.mil," AR at 505, according to Mr. Beernink the DISA server runs the "Enterprise E-mail Security Gateway (EEMSG) program which provides inspection and mitigation of e-mails being sent into the defense agencies." AR at 507, 724. Thus, both can be considered e-gateways to the SOCOM address.

Instead, what mattered was this occurred after the offeror "relinquish[ed] control of [its] e-mail proposal." *Id.* at 97.

On this point, the Court finds the more detailed explanation of the mechanics of e-mail delivery in the *Insight Systems Corp.* opinion to be more useful.  In that case, a private server operated under a contract with the agency was the only server to have received the e-mailed proposal prior to deadline.  *Insight Sys.*, 110 Fed. Cl. at 570.  Government control was based on the security check, and the attempt to forward the message to the second of three servers in the system.  *See id.* at 576–77, 579 n.20.  The receiving server was found analogous to a mail room, *id.* at 578, even though, like the DISA server, it could not forward the message directly to an e-mail inbox.  Here, the DISA server performed the security check and unsuccessfully attempted to forward the message to the server which could deliver it to e-mail inbox.  AR at 507, 681–82.  As noted above, the Court does not see how the receipt of and control over FAST's proposal by the DISA server can be distinguished from the actions of the private server used in *Insight Systems Corp.*  To the contrary, the facts in this case seem even more compelling, because the server *was* owned and operated by the government, and only one layer of servers stood between it and the recipient's e-mail inbox.  The choice of the government to use a server located outside of the procuring agency is of no significance.  Accordingly, the Court holds that when an e-mailed proposal is received by the first server designated by the government to receive e-mails directed to the address contained in a solicitation, it has been "received at the Government installation designated for receipt of offers," 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2), for purposes of the Government Control exception.

The record contains "acceptable evidence to establish that" the proposal was timely received.  *Id.*  A government computer record indicates that FAST's e-mail was received by the DISA server at 11:58 a.m., was scanned for viruses, and was forwarded to and bounced back from the SOCOM server at 12:02 p.m.  AR at 681–82.  This sufficiently demonstrates government control over the proposal.  *See Insight Sys.*, 110 Fed. Cl. at 576–81.

The Court also finds that FAST's e-mail complied with the instruction that attached files total no more than 20 megabytes in size.  *See* AR at 477.  A computer record generated by plaintiff shows that the files totaled 17.93 megabytes when sent.  AR at 620.  This was confirmed by Mr. Mohammed, who took the extra step of determining that the data in the e-mail itself, including "MIME formatting," could not have been more than one megabyte.  AR at 716.  This evidence is credible, in light of the fact that four other offerors had similarly represented that their e-mails were rejected due to the size limit, although attached files measured less than 20 megabytes when sent.  For instance, [Offeror I] received a "size limit exceeded" notice regarding an e-mail containing the fourth part of its proposal, when the two versions sent separately apparently measured 8 and 18 megabytes.  *See* AR at 837–38.  And an [Offeror L] e-mail with a 15 megabyte file was rejected.  AR at 862.

Most telling, however, is the government's own documentation concerning the other two offerors who encountered this problem. [Offeror D] claimed that the files containing its proposal totaled approximately 17 megabytes, but its e-mail was rejected due to size. AR at 825. The DISA server measured the e-mail to contain 21.39 megabytes. AR at 679. Yet when the same files were split among two separate e-mails, the two e-mails totaled less than 16 megabytes when received by the agency. AR at 726 (Offeror D), 828. Similarly, the e-mail containing the proposal of [Offeror N] was rejected as too large, *see* AR at 884, but when its files were spread among two e-mails, the agency measured them to be 10 and 6 megabytes in size when received, AR at 726 (Offeror N), 887. At least for purposes of measuring data, it seems the government servers found whole proposals to be greater than the sums of their parts.[21]

The experiences of these other offerors not only corroborate FAST's claim as to the size of its proposal, but also prove that the agency was the source of the offerors' problems. The Solicitation informed offerors that "[t]he maximum size of any files coming through on any one email is 20MB." AR at 477. The DISA server either improperly measured the size of e-mails containing files totaling 15 megabytes and greater, or did something to enlarge such files by more than one-third. In either event, an offeror can only know the size of files when they are sent, not when they are received by the government, and the agency misled offerors into believing that files totaling up to 20 megabytes in size could be sent on one e-mail, as the actual limit was clearly much lower. Indeed, the size instruction was itself arbitrary, as the Contracting Officer admitted that she "did not test whether SWMS@SOCOM.mil would accept files up to 20MB." Stevens Decl. ¶ 3. The Court concludes that the agency acted arbitrarily and capriciously in not applying the Government Control exception to accept FAST's proposal.

### 2. *The Agency's Arbitrary Actions were Prejudicial*

The proposal submitted by FAST was not delivered to the agency e-mail inbox for the procurement, because the government's servers failed to accept files totaling up to 20 megabytes as advertised. Although the e-mail containing this proposal was timely received by the DISA server, and was under the government's control when safety checks were performed and the forwarding of the e-mail was attempted, the government arbitrarily decided not to accept the proposal under the Government Control exception to the lateness rule, 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2). This clear violation of the FAR was prejudicial to FAST, for it is "beyond peradventure" that an agency's arbitrary refusal to accept a proposal for evaluation imposes "a 'non-trivial competitive injury which can be addressed by

---

[21] The Court notes that FAST's e-mail, containing files totaling 17.93 megabytes when sent, was determined by the DISA server to be 24.84 megabytes large when received. AR at 681.

judicial relief.'" *Insight Sys.*, 110 Fed. Cl. at 581 (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009) (internal quotation omitted)).

On this point too, however, the government attempts to distinguish *Insight Systems Corp.*, on the ground that plaintiff was sent an error message within six minutes of the government's receipt of FAST's e-mail. *See* Def.'s Br. at 17–18; Def.'s Reply at 7.[22]  In contrast, Insight Systems Corp. "was unaware of the problem" with its submission. Def.'s Br. at 18 (quoting *Insight Sys.*, 110 Fed. Cl. at 570).  But while that decision described the Government Control exception as "safeguarding contractors which, through no fault of their own, find themselves unable to deliver their proposal to the government office designated for receipt of proposals," *Insight Sys.*, 110 Fed. Cl. at 579, the Court does not read that precedent as finding fault when contractors fail to take extraordinary steps to work around proposal receipt problems caused by the government.  Rather, that opinion cast doubt on the applicability of the exception to "a contractor which waits until the last moment before emailing its proposal." *Id.* at 581.

Here, FAST met its "responsibility, when transmitting its proposal electronically, to ensure the proposal's timely delivery by transmitting the proposal sufficiently in advance of the time set for receipt of proposals to allow for timely receipt by the agency." *Insight Sys.*, 110 Fed. Cl. at 574 (quoting *Philips Healthcare*, 2012 WL 3611711, at *4).  Its proposal was sent at 11:56 a.m., *see* AR at 579, more than four and one-half hours before the deadline and significantly earlier than the offerors in the *Insight Systems Corp.* and *Watterson Construction Co.* cases. *See Insight Sys.*, 100 Fed. Cl. at 570–71 (one proposal e-mailed one hour and twenty-two minutes before the deadline, and the other twenty-one minutes before the deadline); *Watterson Constr.*, 98 Fed. Cl. at 87 (proposal e-mailed fifty-nine minutes before the deadline).  This is not a situation where the offeror waited until the last moment so it could put the final touches on the bid and was stymied by a normal processing delay or a minor glitch in the system. *Cf. Symetrics Indus., LLC*, B-298759, 2006 CPD ¶ 154, 2006 WL 2946848, at *2–3 (Comp. Gen. Oct. 16, 2006) (denying protest when offeror sent proposal five minutes before deadline and it arrived one minute late); *PMTech., Inc.*, B-291082, 2002 CPD ¶ 172, 2002 WL 31303100, at *2–3 (Comp. Gen. Oct. 11, 2002) (denying protest when offeror attempted transmission thirteen minutes before deadline and receipt was delayed by a one-time malfunction).

---

[22] Although defendant estimates the error message was sent "approximately four minutes after FAST sent its email proposal," Def.'s Br. at 18, the record shows the message was sent six minutes after FAST's proposal was received and eight minutes after the proposal was sent. *See* AR at 579–80, 681–82.

Plaintiff acted responsibly in submitting its proposal with more than four hours to spare, and in following the instruction by attaching files that did not exceed twenty megabytes in total.  AR at 477.  The Court rejects the unsupported contention that FAST was required to resolve e-mail receipt problems that were the government's own doing.[23]

While the government's refusal to accept FAST's proposal for evaluation constitutes sufficient prejudice to support plaintiff's motion for judgment, the Court notes additional prejudice to plaintiff due to the agency's actions.  When FAST's protest was before the GAO, the agency failed to inform that body of four additional offerors who had experienced difficulty transmitting proposals.  *See* AR at 854–90.  Two of these, [Offeror L], AR at 862–68, and [Offeror N], AR at 883–87, had e-mails with files below the 20 megabyte limit rejected due to the size limit.  There is no record of DISA having received an e-mail from another offeror, [Offeror O], addressed to SWMS@socom.mil, yet a proposal from that offeror was accepted for evaluation.  *See* Stevens Decl. ¶ 1.

But one ground for FAST's protest was the "systemic failure" exception, *see, e.g.*, AR at 616 (citing *S.D.M. Supply, Inc.*, B-271492, 96-1 CPD ¶ 288, 1996 WL 349513 (Comp. Gen. June 26, 1996)), which the GAO has found stems from the "agency's obligation to have procedures in place to reasonably safeguard proposals or quotations actually received and to give them fair consideration."  *FAST*, 2014 WL 7660997, at *3; AR at 758 (citing *S.D.M. Supply*, 1996 WL 349513, and *East West Research, Inc.*, B-239565 *et al.*, 90-2 CPD ¶ 147, 1990 WL 278424 (Comp. Gen. Aug. 21, 1990)).   The GAO --- believing that only "three proposals initially were rejected," that "the agency successfully received 15 proposals," and that "[a]ll offerors that diligently pursued submission of their proposals were eventually successful, and the agency received 15 timely proposals" --- found that there was no systemic failure.  *See FAST*, 2014 WL 7660997, at *3; AR at 758.  As we have seen, there were actually seven proposals initially rejected, and only thirteen were received in full at the proper address by the deadline.

The GAO stated in its decision that "[a] finding that a proposal or quotation was not received due to a 'systemic failure,' . . . requires more than 'the occasional negligent loss' of a proposal or quotation."  *FAST*, 2014 WL 7660997, at *3; AR at 758 (citing *E.W. Research* 1990 WL 278424, at *3).  But as explained in *Project*

---

[23]  Although the record does not reflect this, plaintiff's chief executive officer was apparently working on a government contract in a Sensitive Compartmented Information Facility during the pendency of this protest, and this location may have prevented his ability to monitor the agency's receipt of FAST's timely-submitted and properly-sized e-mailed proposal.  Hr'g at 12:06–07, 12:10–11.

*Resources, Inc.*, B-297968, 2006 CPD ¶ 58, 2006 WL 846353 (Comp. Gen. Mar. 31, 2006), the GAO:

> has recognized a limited exception to the rule that negligent loss of proposal information does not entitle the offeror to relief.  The exception generally applies where the loss was not an isolated act of negligence, but was the result of a systemic failure resulting in *multiple* or *repetitive* instances of lost information.

*Id.* at *3 (citing *E.W. Research*, 1990 WL 278424) (emphasis added).  The GAO went on to note that the exception did not apply in the case of Project Resources because "[t]here is no evidence that the agency, for example, lost the proposal information submitted by *other offerors* in this procurement."  *Id.* (emphasis added).

Perhaps had the GAO been told the actual number of offerors which had e-mailed proposals rejected, it would have reached a different conclusion.  Or it might have done so, had it been informed that at least one e-mail sent by [Offeror I] was not accounted for, *see supra* note 14, or that there was no record of any e-mail sent by [Offeror O] to the e-mail address designated in the Solicitation.  On this last point, the Court is particularly concerned that the GAO, which does not recognize the extension of the Government Control exception to cover e-mailed proposals, *see Sea Box, Inc.*, 2002 WL 31445297, at *2, was not told that the agency employed this exception to accept the [Offeror O] proposal.  The GAO found FAST's proposal "was never received at the agency email address designated for receipt of proposals," *FAST*, 2014 WL 7660997, at *2; AR at 757, yet the same was true of [Offeror O's] proposal.  Knowledge that an exception was made for [Offeror O] may have resulted in a different outcome before the GAO.  *Cf. Philips Healthcare*, 2012 WL 3611711, at *4 (explaining that one of the purposes of the "late is late" rule is that it "ensures equal treatment of all offerors").  Although not necessary for FAST to prevail, the Court concludes that the agency's failure to disclose to the GAO the full extent of problems encountered by offerors in e-mailing their proposals, and its application of the Government Control exception to the benefit of another offeror, was to plaintiff's prejudice by preventing a fully informed consideration of the protest grounds raised by FAST.

### 3.  *Injunctive Relief is Appropriate*

In a bid protest, our court has the power to issue a permanent injunction pursuant to 28 U.S.C. § 1491(b)(2).  Once a plaintiff has succeeded on the merits, in determining whether to grant a permanent injunction, the court considers three factors: (1) whether the plaintiff will suffer irreparable harm if the procurement is not enjoined; (2) whether the harm suffered by the plaintiff, if the procurement action is not enjoined, will outweigh the harm to the government and third parties; and (3) whether granting injunctive relief serves (or is at least not contrary to) the public interest.  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir.

- 23 -

2009); *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 383 (2013). None of the three factors, standing alone, is dispositive; thus, "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 378 (2009). Conversely, the lack of an "adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors," to deny the injunction. *Chrysler Motors Corp. v. Auto Body Panels, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990).

It is well-established that the profits lost by an offeror because of the government's arbitrary or unlawful rejection of an offer constitute irreparable injury for purposes of injunctive relief. *See MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 552 (2011). The alternative to a permanent injunction, recovery of bid preparation and litigation costs, does not redress the loss of the opportunity to compete on a level playing field for a valuable business contract. The Court finds that, absent injunctive relief, plaintiff will suffer irreparable harm. *See* Housewright Decl. ¶ 10, Ex. 1 to Mot. for TRO.

Regarding the second factor, "the court must consider whether the balance of hardships leans in the plaintiff's favor," requiring "a consideration of the harm to the government." *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715 (2006); *see also Lab Corp. of Am. v. United States*, 108 Fed. Cl. 549, 568 (2012). No potential harm to the government has been identified. An injunction to require consideration of plaintiff's proposal would not delay the procurement, which had already been prolonged due to GAO protests and, as described above, by the agency's failure to fully inform the GAO of material facts pertaining to FAST's protest.

Finally, concerning the third factor, the public interest is unquestionably served by an injunction requiring an agency to accept for evaluation a timely-received proposal. Such an injunction furthers "the public interest in honest, open, and fair competition in the procurement process." *Insight Sys.*, 110 Fed. Cl. at 582–83 (quoting *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003)). Here, the public's interest lies in preserving the integrity of the competitive process by enjoining the agency from making an award without giving due consideration to FAST's proposal.

## III. CONCLUSION

For the reasons discussed above, plaintiff's motion for judgment on the administrative record is **GRANTED**, and defendant's cross-motion for judgment on

the administrative record is **DENIED**.[24]  Accordingly, **IT IS ORDERED** that the United States, including the U.S. Special Operations Command, its Contracting Officer, its other officers, agents, servants, employees, and representatives, and all persons acting in concert and participating with them respecting the procurement under Solicitation No. H92222-14-R-0019, are hereby PERMANENTLY RESTRAINED AND ENJOINED from making an award under Solicitation No. H92222-14-R-0019, unless the proposal sent by Federal Acquisition Service Team, LLC to SWMS@socom.mil at 11:56 a.m. on September 15, 2014, is accepted and evaluated on the same terms as other proposals already accepted.  The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

                                        s/ Victor J. Wolski
                                        **VICTOR J. WOLSKI**
                                        Judge

---

[24]  Because the Court has resolved the case in favor of plaintiff based on the substantive issues raised by the parties, Plaintiff's Motion to Strike, ECF No. 30, based on complaints plaintiff has with certain procedural matters regarding the presentation of the government's arguments in its briefs, is **DENIED-AS-MOOT**.